RIALTO O. ARNOLD, administrator of WRIGHT ROBINS, deceased, et al., appellants,

*v.*

THEODORE R. ROBINS et al., respondents.

On appeal from a decree of the chancellor, who filed the following opinion :

The bill is filed by two of the children of the late Amos Robins to substantiate their claim to certain land in Raritan township, Middlesex county, of which Wright Robins, deceased, died seized, and which they claim was bought by him with money of theirs in his hands as their trustee. He died insolvent, March 10th, 1882. Their right to the trust-fund arose under the will of John Robins, deceased, who died in 1864, and by the will, among other bequests, gave one-ninth of the residue of his estate to his executors in trust, to invest it and apply the interest and income thereof to the use of his niece, Maria Robins, for her life, and on her death to divide and pay over the principal and all unappropriated income thereof to his then living nephews and nieces ; the issue of any deceased nephew or niece to take by substitution the share of the deceased parent. There was a like bequest of another ninth to Caroline McClure, with like limitation over. The executors who proved the will were George W. Robins and Wright Robins. The latter survived the former, who had the Maria Robins and Caroline McClure trust-funds in his hands up to the time of his death. Wright Robins received them from the

executors of George W. Robins, October 12th, 1868. The shares which so came to the hands of Wright Robins amounted together to about $340,000. Maria Robins died in 1871. Amos Robins (father of the complainants), one of the testator's nephews, died. June 27th, 1871, before her decease. Two of the children of Amos Robins received their shares of the principal of the Maria Robins fund from Wright Robins, but the complainants, the other two children, who were minors, did not receive theirs. He retained them in his hands, claiming a right to do so because the complainants were minors. The complainants allege that he invested the money ($17,750) in land in Raritan township, in Middlesex county, and this suit is brought against his administrator *cum testamento annexo*, and his widow and children, to establish that claim. On the 15th of December, 1875, Wright Robins gave to the mother of the complainants as their guardian his two promissory notes for $8,877.79, payable on demand, with interest, and at the same time gave to her a statement in writing in reference to each note, that the note was given for money then in his hands belonging to her ward named therein. The notes were given to her on her requesting him to give her some paper showing that he held the money in trust for her children, and they were given merely as memoranda accordingly. He paid the interest on the money up to December 15th, 1879, but he did not pay the six months' interest due then until some time after it became due. Mrs. Robins sent him several written notices to pay that interest, but he paid no attention to any of them. She finally told him that unless he responded to her communications she would try to collect the money. He then came to her house and said he had come to have the matter settled up. He requested her to bring the memoranda. She understood him to mean that he was going to pay the money, both principal and interest. She brought the papers and laid them upon the table in the room. He then produced the checks for the interest, and taking up the memoranda tore them in pieces and put them into his pocket, and told her to go and see her lawyer and tell him that he was trustee, and had Vanderbilt to back him. William R. Robins testifies that Wright Robins, in.

:a conversation which he had with him referring to that transaction, complained that Mrs. Robins had written to him threatening that if he did not pay the interest she would take legal advice and try to collect the principal and interest of the fund. He said she had no right to do that; that he held the money as trustee, and that the complainants' shares were entirely safe. The witness says he asked Mr. Robins where the money was and what he had done with it, and the latter said that he had bought the Jones place with that money, and (the witness thinks) some two or three acres opposite, and some lots which he had bought at the Jones sale near the Robinvale depot. He says Mr. Robins also said that he did not know that he was bound to pay interest for the money, but he supposed he would be responsible for the rent of the house.

This conversation took place in the spring of 1880. A week or ten days afterward, the witness had another conversation with him, on an occasion when an agent of the Safe Deposit Company of New York came to collect rent for the safe which Mr. Robins had kept there. Mr. Robins said he had no use for a safe anyhow, that he had nothing to put into it. The witness said, " There are the trust-funds belonging to Dorry and Maggie " (the complainants), and Mr. Robins replied, " You know I told you they were in the Jones place, two acres opposite, and the lots near the Robinvale depot." The witness then said, " There are the trust-funds of Mrs. McClure, which you hold also," and Mr. Robins replied that they were all safe, that they were in the twenty acres he bought of Mr. Benner, a part of grandfather Ross's estate, and also the place where he, Robins, then lived, and a little cottage down in the village of Metuchen. The witness said, " How can that be, since you bought this place [the place where he lived] before the trust-fund was created ? " Mr. Robins replied that that was all right; that he had spent the money in improving the place and in building the new depot; that the property would rise in value; and that none of those who were interested in the fund would ever suffer any loss. The witness further says that Mr. Robins said " he took the money " out of the McClure fund to build the Robinvale depot,

and that the depot had cost him between $18,000 and $20,000. He also testifies that a considerable length of time afterward he had another conversation with Mr. Robins in reference to a mortgage of $12,000, which the latter gave about eighteen months or two years before he died (he died in March, 1882) on some of his real property. This conversation, he says, took place about the middle of the December next succeeding the date of the mortgage. He says he asked Mr. Robins why he had mortgaged the property where he lived, and why he had not mortgaged instead of that the part of his property where the little cottage is, and the twenty-acre lot, since if he had done so he would have had his home free from mortgage; and Mr. Robins gave as his reason for not mortgaging that part of his property that he considered that as belonging to the trust-fund, and added that it was his intention to cut streets through it and to cut it up into building lots, and he said that by that means he would be able to get back the trust-fund that he had used, and in time would be able to get back all the money he had used, and "the heirs" would not lose anything. The McClure fund is not involved in this suit, but the testimony just quoted in reference to it is important as showing how Mr. Robins dealt with the trust-moneys in his hands, and that in saying that those funds were in the properties to which he referred, he meant that he had invested them there, and not merely that there was value enough in them alone as part of his individual property to secure those entitled to the funds against loss from his misappropriation thereof. He said he had spent the money of the McClure fund in "improving the place and new depot," that he "took the money out of the McClure fund to build the Robinvale depot," which had cost him between $18,000 and $20,000. Speaking with reference to the money belonging to the complainants, he said he had bought the Jones place with it, and some two or three acres opposite, and some lots near the Robinvale depot, which he had bought at the Jones sale. He also said he supposed he would be responsible to the complainants for the rent of the house, meaning the house on what he called the Jones property. It is worthy of note that the decla-

ration as to the investment of the complainants' money in the land was made two years before Mr. Robins's death. It is urged, on the part of the defendants, that he was then not only solvent, but possessed of considerable wealth. If this was so in fact, it would give additional force to the declaration, inasmuch as in that case he would have had no reason at the time for making any false representation on the subject.

It appears from the evidence that in October, 1873, he transferred government securities of the trust-funds in his hands to the amount of $50,000. On the same day (October 18th) on which the transfer was made, $7,500 of government securities were issued to him individually. If they were part of the $50,000, $42,500 remains unaccounted for. He also transferred of the trust-funds, on the 2d of January, 1874, $10,000, and the like amount August 20th, 1874, which, with the $42,500, are not accounted for, and are not traceable, except as it appears, according to his own statements, that he made the before-mentioned investments of the trust-money in lands. And here it may be remarked that he appears to have transferred to himself individually, between January 2d, 1874, and the 16th of July, 1879, government securities, held by him as trustee, to the amount of $145,000, of which $120,000 appears to have been re-issued to him individually, and the remainder, $25,000, cannot be traced. And he disposed of all the government securities issued to him individually (they amounted to $127,500) by the 13th of March, 1880, two years before he died. The evidence of his statements that he had invested the complainants' money in the " Jones place, two acres opposite and the lots near the Robinvale depot," is clear and positive, and is, in no wise, contradicted or impugned. Those lands are property (about five and a half acres) conveyed by David J. Ely to Wright Robins by deed dated July 1st, 1873, and property conveyed by Laura E. Jones to him by three deeds, two of which are dated June 13th, 1874, and the other July 6th, 1874. Part of the consideration (which was $20,000) of the conveyance of the first-mentioned property was the conveyance by Robins to Ely of land known as the Himrod property, bought by Robins of

Camden *v.* Newell.

Himrod in 1869. The rest of the consideration was $5,000 in cash. This sum must be held to have been paid with the complainants' money. The complainants insist that they are entitled to claim the sum of $1,500 also, as having been paid out of their trust-money by Robins upon the Himrod property (which he was to convey to Ely free of encumbrance) in discharging a mortgage thereon. It appears that Robins told Mr. Van Dyck, the attorney whom he sent to the holder of the mortgage to obtain the discharge, to say to the latter that he had paid the amount of the mortgage, and gave him his affidavit to that effect; but it does not appear with or out of what money the mortgage was paid off. The $5,000 cash paid on account of the consideration of the Ely property will, with the interest thereon and the costs of this suit, be charged upon that property, and the properties conveyed to Mr. Robins by Laura Jones will be decreed to belong to the complainants. .

*Mr. J. Henry Stone,* for appellants.

*Mr. Charles T. Cowenhoven,* for respondents.

PER CURIAM.

This decree unanimously affirmed, for the reasons given by the chancellor in the foregoing opinion.